# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

THE NORTH RIVER INSURANCE                 )
COMPANY,                                   )          Case No.
                                           )
        Plaintiff,                       )
                                           )
    v.                                     )
                                           )
BISHOP OF PUEBLO, a corporation sole,      )
THE MARIANISTS PROVINCE OF THE             )
       UNITED STATES, INC.,             )
RONALD L. HOUSTON,                         )
TOM MONROE,                                )
DONALD JESIK,                              )
JACK KLUN,                                 )
J.M.,                                      )
T.A.,                                      )
JOHN DOE,                                  )
JOHN DOE 2,                                )
JOHN DOE 3,                                )
JOHN DOE 4,                                )
JOHN DOE 5,                                )
JOHN DOE 6,                                )
JOHN DOE 7,                                )
JOHN DOE 8,                                )
JOHN DOE 9,                                )
JOHN DOE 10,                               )
JOHN DOE 11,                               )
JOHN DOE 12,                               )
JOHN DOE 13,                               )
JOHN DOE 14,                               )
JOHN DOE 15,                               )
JOHN DOE 16,                               )
JOHN DOE 17                                )
                                           )
       Defendants                       )
_____)

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff THE NORTH RIVER INSURANCE COMPANY (hereinafter "North River" or "the Company"), through its attorneys, Merlo Kanofsky Brinkmeier & Gregg Ltd., and Treece, Alfrey, Musat & Bosworth, P.C., complains of Defendants BISHOP OF PUEBLO (hereinafter "the Diocese") and THE MARIANISTS PROVINCE OF THE UNITED STATES, INC. (hereinafter "Marianists") as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory judgment, brought pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332, to determine real and justiciable controversies among the parties with respect to their rights and obligations pertaining to insurance coverage under insurance policies the Diocese alleges that North River issued for certain claims described more fully below and set forth in actions *John Doe v. Diocese of Pueblo*; *John Doe 2 v. Diocese of Pueblo*; *John Doe 3 v. Diocese of Pueblo*; *John Doe No. 4 v. Diocese of Pueblo*; *John Doe No. 5 v. Diocese of Pueblo*; *John Doe No. 6 v. Diocese of Pueblo*; *John Doe No. 7 v. Diocese of Pueblo*; *John Doe No. 8 v. Diocese of Pueblo*; *John Doe No. 9 v. Diocese of Pueblo*;  *John Doe 10 v. Diocese of* Pueblo; *John Doe 11 v. Diocese of* Pueblo;  *John Doe 12 v. Diocese of Pueblo*; *John Doe 13 v. Diocese of Pueblo*; *John Doe 14 v. Diocese of Pueblo*; *John Doe 15 v. Diocese of Pueblo*; *John Doe 16 v. Diocese of Pueblo*; *John Doe 17 v. Diocese of Pueblo*; *Donald Jesik v. Diocese of Pueblo*; *J.M. v. Diocese of Pueblo*; *Jack Klun v. Diocese of Pueblo*; *Monroe v. Diocese of Pueblo;* and *T.A. v. Diocese of Pueblo,* filed in the District Court for Pueblo County, Colorado (hereinafter collectively "the Underlying Actions").

## IDENTITY OF PARTIES

2.      North River is an insurance company incorporated in New Jersey, and its principle place of business is in Morris Township, New Jersey.

3.      Defendant, Bishop of Pueblo, is a corporation sole responsible for the operations

2

of the Diocese of Pueblo and the interests of the Roman Catholic Church in southern Colorado. The Bishop of Pueblo's jurisdiction and responsibilities include the operations of all Catholic schools within its geographical boundaries.  The Diocese of Pueblo is a trade name owned by the Bishop of Pueblo pursuant to the laws of the State of Colorado.  Hereinafter, the Bishop of Pueblo and Diocese of Pueblo will be referred to as "the Diocese". The Diocese owned and operated the property and physical structure of Roncalli High School, which was an all-boys Catholic high school in Pueblo, Colorado, and at all times relevant hereto was doing business in Pueblo County, Colorado.  The Diocese is a defendant in the Underlying Actions.

4.     The Marianists is a Catholic Religious Order and a non-profit Missouri Corporation, and at all times relevant hereto was doing business in Pueblo, Colorado. Additionally, based upon information and belief, the Marianists staffed the Roncalli High School during all times relevant hereto.

5.     Plaintiffs in the Underlying Actions (hereinafter "Claimants") reside in the following states: Jack Klun resides in Utah, J.M. resides in New Mexico, T.A. resides in California, John Doe No. 9 resides in Oregon, John Doe No. 13 resides in Switzerland, John Doe No. 14 resides in Florida, John Doe No. 15 resides in Texas and the remaining Claimants reside in Colorado. Claimants have made claims against the Diocese and the Marianists and are necessary parties to the above-captioned matter.

**JURISDICTION AND VENUE**

6.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Pursuant to 28 U.S.C. § 2201, this action is brought by North River, a corporation organized under the law of the State of New Jersey, with its principal place of business in New Jersey, against the Diocese, a Colorado not for profit corporation, the Marianists, a Missouri not

for profit corporation and the Claimants, who reside in states other than New Jersey. The amount in controversy exceeds the jurisdictional limits.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim for insurance coverage occurred in the District of Colorado, and the Underlying Actions giving rise to the claim for insurance coverage are being litigated in the Colorado State District Court in Pueblo County, Colorado.

## UNDERLYING ACTIONS

8.      The Underlying Actions are comprised of 22 separate complaints, all containing similar allegations and causes of action.  In general, all but one of the Underlying Plaintiffs alleged they were sexually assaulted by Brother William Mueller (hereinafter "Mueller") while he was employed as a teacher by the Diocese. One complaint (John Doe No. 7) contains allegations related to a Priest, Father Burke, at the Diocese of Pueblo rather than allegations against Mueller. The Complaints are all approximately 9 pages in length and have a number of identical general allegations followed by allegations specifically addressing the incidents of abuse against each Claimant. The Diocese and the Marianists are the only defendants named in each Complaint, and each Complaint contains one cause of action based upon negligence.

9.      *John Doe v. Diocese of Pueblo*:  The John Doe Complaint, which has been attached hereto as Exhibit A, asserts that John Doe was born in 1954 and attended Roncalli High School from 1969 through 1971.  (Complaint at ¶ 17)  John Doe was a junior during the Fall of 1970 when Mueller asked him to participate in a psychological experiment for a graduate school thesis.  (Complaint at ¶ 18)  After placing brill cream into Plaintiff's hair Mueller covered Plaintiff's mouth and nose with a cloth soaked in ether or chloroform.  (Complaint at ¶ 21)

When Plaintiff regained consciousness he noticed his anus and genitals were sore and covered with abrasions.  (Complaint at ¶ 23)  Based upon these factual allegations, Plaintiff asserted one cause of action based upon negligence.

10.   *John Doe No. 2 v. Diocese of Pueblo*:  The John Doe No. 2 Complaint, which has been attached hereto as Exhibit B, asserts that John Doe No. 2 was born in February of 1955 and attended Roncalli High School from 1969 through 1971.  (Complaint at ¶ 17)  During the 1969-1970 school year Mueller approached John Doe No. 2 and asked him to assist with a confidential science experiment on why men were leaving the priesthood.  (Complaint at ¶ 18)  John Doe No. 2 met Mueller after school in a band room where he was tied to a chair and had a cloth soaked in ether or chloroform over his face.  (Complaint at ¶ 20)  John Doe No. 2 was sexually assaulted when he lost consciousness.  Based upon these factual allegations, John Doe No. 2 asserted one cause of action based upon negligence.

11.   *John Doe No. 3 v. Diocese of Pueblo*:  The John Doe No. 3 Complaint, which has been attached hereto as Exhibit C, asserts that John Doe No. 3 was born in November of 1956 and attended Roncalli High School from 1970 through 1971.  (Complaint at ¶ 17)  Mueller took John Doe No. 3 out of study to a private office where he placed a cloth soaked in ether or chloroform over John Doe No. 3's face.  (Complaint at ¶ 18)  When John Doe No. 3 passed out Mueller sexually assaulted him.  (Complaint at ¶ 19)  Based upon these factual allegations, John Doe No. 3 asserted one cause of action based upon negligence.

12.   *John Doe No. 4 v. Diocese of Pueblo*:  The John Doe No. 4 Complaint, which has been attached hereto as Exhibit D, asserts that John Doe No. 4 was born in July of 1955 and attended Roncalli High School from 1969 through 1971.  (Complaint at ¶ 17)  During John Doe

5

No. 4's freshman year Mueller asked he participate with a science experiment concerning why men do not join the priesthood.  (Complaints at ¶ 20)  At some point Mueller placed a cloth under John Doe No. 4's nose which is believed to have been soaked in chloroform.  (Complaint at ¶ 21)   John Doe No. 4 lost consciousness and was then sexually abused by Mueller.  (Complaint at ¶ 23)  Based upon these factual allegations, John Doe No. 4 asserted one cause of action based upon negligence.

13.     *John Doe No. 5 v. Diocese of Pueblo*:  The John Doe No. 5 Complaint, which has been attached hereto as Exhibit E, asserts that John Doe No. 5 was born in June 1954 and attended Roncalli High School from 1968 through 1970.  (Complaint at ¶ 17)  John Doe No. 5 worked after school to pay his tuition.  During a conversation with Mueller, John Doe No. 5 stated that he was going to leave Roncalli and move to New Mexico with his family.  (Complaint at ¶ 18)  Mueller excused himself from the room and when he returned he snuck up from behind and placed a cloth soaked in ether over John Doe No. 5's mouth.  (Complaint at ¶ 19)  Mueller removed John Doe No.5's clothing and sexually assaulted him while he lay unconscious.  Based upon these factual allegations, John Doe No. 5 asserted one cause of action based upon negligence.

14.     *John Doe No. 6 v. Diocese of Pueblo*:  The John Doe No. 6 Complaint, which has been attached hereto as Exhibit F, asserts that John Doe No. 6 was born in September of 1954 and attended Roncalli High School from 1969 through 1971.  (Complaint at ¶ 17)  On dozens of occasions Mueller would fondle John Doe No. 6 under the pretense of checking to see if Plaintiff was in compliance with the school dress code.  (Complaint at ¶ 18)  Based upon these factual allegations, John Doe No. 6 asserted one cause of action based upon negligence.

15.     *John Doe No. 7 v. Diocese of Pueblo*:  The John Doe No. 7 Complaint, which has been attached hereto as Exhibit G, asserts that John Doe No. 7  was born in July of 1960 and was counseled by Father Burke (related to his parent's marital problems) in approximately 1970. (Complaint at ¶ 16)   Father Burke conducted experiments on John Doe No. 7 wherein he blindfolded John Doe No. 7, removed John Doe No. 7's clothing, and tied him to pipes located in the church rectory.  While John Doe No. 7 was restrained Father Burke would rub his genitals against him and masturbate.  (Complaint at ¶ 18)   This conduct continued for approximately three to four years.  Based upon these factual allegations, John Doe No. 7 asserted one cause of action based upon negligence.

16.     *John Doe No. 8 v. Diocese of Pueblo:*  The John Doe No. 8 Complaint, which has been attached hereto as Exhibit H, asserts that John Doe No. 8 was born in April of 1956 and attended Roncalli High School from September 1970 through June 1971.  (Complaint at ¶ 17) During this time John Doe No. 8 was enrolled in religion and music courses taught by Mueller. Shortly after the beginning of the school year, Mueller asked John Doe No. 8 to stay after school and help with a special project.  (Complaint at ¶ 18)   Mueller told John Doe No. 8 he was working on his masters' thesis in psychology and asked Plaintiff to participate by lying on a table in a storage room.  (Complaint at ¶ 19-20)   Mueller then placed a rag soaked in chloroform or ether over Plaintiff's mouth and nose and as Plaintiff lost consciousness, Mueller began fondling Plaintiff.  (Complaint at ¶ 20-21)   Based upon these factual allegations, Plaintiff asserted one cause of action based upon negligence.

17.     *John Doe No. 9 v. Diocese of Pueblo:*  The John Doe No. 9 Complaint, which has been attached hereto as Exhibit I, asserts that John Doe No. 9 was born in February 1953 and

attended Roncalli High School for September 1968 through June 1971.  (Complaint at ¶ 17) During this time John Doe No. 9 participated in the school band which was led by Mueller. During John Doe No. 9's junior year Mueller led John Doe No. 9 into an office adjacent to the band room, placed an ether-soaked rag over his mouth, blindfolded him, tied his hands together and sexually abused him.  (Complaint at ¶ 18)  Once John Doe No. 9 awoke Mueller told him that he had performed a psychological experiment as part of his masters' thesis.  (Complaint at ¶ 19)  Based upon these factual allegations, John Doe No. 9 asserted one cause of action based upon negligence.

18.     *John Doe No. 10 v. Diocese of Pueblo*: The John Doe No. 10 Complaint, which has been attached hereto as Exhibit J, asserts that John Doe No. 10 was born in March of 1951 and attended Roncalli High School from September 1965 through June 1969.  (Complaint at ¶ 7) During the Spring semester of John Doe No. 10's sophomore year, which would be approximately 1967, Brother Mueller asked John Doe No. 10 to meet him in the band room after school to help with a special project.  (Complaint at ¶ 8)  When John Doe No. 10 arrived Brother Mueller placed a cloth soaked in ether over his face and asked that he take a deep breath. (Complaint at ¶ 9)  After approximately 30 minutes Brother Mueller asked John Doe No. 10 to walk around at which time Plaintiff noticed "his underwear was disheveled and inside out". (Complaint at ¶ 11)   John Doe No. 10 further alleges that Defendants actively took steps to conceal the abuse in order to protect Brother Mueller. (Complaints at ¶ 14)  Based upon these factual allegations, John Doe No. 10 asserted one cause of action based upon negligence.

19.     *John Doe No. 11 v. Diocese of Pueblo:* The John Doe No. 11 Complaint, which has been attached hereto as Exhibit K, asserts that John Doe No. 11 was born in March of 1949

and obtained his entire education in Catholic schools operated by the Bishop of Pueblo. (Complaint at ¶ 6)  John Doe No. 11 attended Roncalli High School during the 1966-1967 school year and met Brother Mueller during the Spring semester of his senior year.  Brother Mueller asked John Doe No. 11 to meet him on a Saturday night to help with a special project. (Complaint at ¶ 8)  At that time, Brother Mueller explained to John Doe No. 11 that "he was performing a confidential, psychological experiment on why brothers were leaving the Marianists."  (Complaint at ¶ 9)  Brother Mueller also asked John Doe No. 11 to remove his shirt, face the wall, and then blindfolded him.  Brother Mueller then placed a white cloth soaked in ether over John Doe No. 11's face.  (Complaint at ¶ 10)  Brother Mueller next attempted to sexually abuse John Doe No. 11 until he woke up and "began to panic."  (Complaint at ¶ 11) Based upon these factual allegations, John Doe No. 11 asserted one cause of action based upon negligence.

20.     *John Doe No. 12 v. Diocese of Pueblo:*  The John Doe No. 12 Complaint, which has been attached hereto as Exhibit L, asserts John Doe No. 12 was born in October of 1955 and attended Roncalli High School from the Fall of 1969 through Spring of 1971.  (Complaint at ¶ 7) In February of 1971 Brother Mueller asked John Doe No. 12 to meet him in the band room after school to help out with a "special project."  (Complaint at ¶ 8)  When John Doe No. 12 arrived in the band room he saw a handwritten note reading "Sit down in the chair with your back to the door."  A few minutes later Brother Mueller entered the room, turned off the lights, blindfolded John Doe No. 12, and tied his hands together.  Brother Mueller then placed a cloth soaked in ether over John Doe No. 12's mouth and sexually abused him.  (Complaint at ¶ 9)  John Doe No. 12 further asserts that he reported this abuse to Father Richard O'Shaughnessy, a member of the

Marianists.  (Complaint at ¶ 10)  Based upon these factual allegations, John Doe No. 12 asserted one cause of action based upon negligence.

21.    *John Doe No. 13 v. Diocese of Pueblo:*  The John Doe No. 13 Complaint, which has been attached hereto as Exhibit M, asserts John Doe No. 13 was born in July of 1952 and attended Roncalli High School from the Fall of 1966 until his graduation in Spring of 1970. (Complaint at ¶ 7)  In the Fall semester of 1970 John Doe No. 13 typically had to stay at school to participate in student government where he would encounter Brother Mueller.  (Complaint at ¶ 8)  On one occasion John Doe No. 13 was in a closet used by student government to store canned goods when Brother Mueller entered the closet and placed John Doe No 13's hands against the wall and spread his legs apart for what he called an experiment.  Brother Mueller then asked Plaintiff "would you trust me with the lights out?"  Despite John Doe No. 13 saying he did not trust him, Brother Mueller turned the lights out "and grinded his erect penis against" John Doe No. 13.  (Complaint at ¶ 9)  Based upon these factual allegations, John Doe No. 13 asserted one cause of action based upon negligence.

22.    *John Doe No. 14 v. Diocese of Pueblo*:  The John Doe No. 14 Complaint, which has been attached as Exhibit N, asserts John Doe No. 14 was born in June of 1953 and attended Roncalli High School from the first semester of his freshman year in 1967-68 and during his senior year during the 1970-71 school year.  (Complaint at ¶ 7)  Brother Mueller asked John Doe No. 14 to meet him after school to assist with a project he purportedly needed to complete to obtain his Masters degree in Psychology.   Brother Mueller explained the experiment was confidential and must not be disclosed to anyone.  (Complaint at ¶ 8)  John Doe No. 14 met Brother Mueller in his office near the band room where Brother Mueller snuck up from behind

and placed a rag soaked with ether over his face. (Complaints at ¶ 9)  Brother Mueller sexually

abused John Doe No. 14 once he lost consciousness.  (Complaint at ¶ 10)  Based upon these

factual allegations, John Doe No. 14 asserted one cause of action based upon negligence.

23.     *John Doe No. 15 v. Diocese of Pueblo*:  The John Doe No. 15 Complaint, which

has been attached hereto as Exhibit O, asserts that John Doe No. 15 was born in November of

1949 and attended Roncalli High School from Fall 1965 until Spring 1968.  (Complaint at ¶ 7)

During John Doe No. 15's junior year Brother Mueller asked him to participate in a study about

why clergy was leaving the church.  Brother Mueller asked John Doe No. 15 to meet him after

school in the band room.  (Complaint at ¶ 8)  Shortly after Brother Mueller instructed John Doe

No. 15 to sit down on a chair in his office Brother Mueller snuck up from behind and placed a

cloth soaked in ether over John Doe No. 15's face and sexually assaulted him when he lost

consciousness.  (Complaint at ¶ 9)  Based upon these factual allegations, John Doe No. 15

asserted one cause of action based upon negligence.

24.     *John Doe No. 16 v. Diocese of Pueblo*:  The John Doe No. 16 Complaint, which

has been attached hereto as Exhibit P, asserts John Doe No. 16 was born in January of 1955 and

attended Roncalli High School from during his freshman and sophomore years until the school

closed in 1971.  (Complaint at ¶ 7)  John Doe No. 16 was struggling in band and as a result spent

many hours in the band room with Father Mueller.  (Complaint at ¶ 8)  One incident involved

John Doe No. 16 being taken out of lunch and led to Brother Mueller's room in the residence

hall.  Brother Mueller instructed John Doe No. 16 to sit on the edge of his bed and wait for

Brother Mueller to return with materials for an experiment.  Shortly thereafter Brother Mueller

returned with a wash rag and placed it over John Doe No. 16's face causing him to pass out.

When Plaintiff awoke he found himself alone in the room with shirt unbuttoned and his belt and pants undone. (Complaint at ¶ 9) This happened again one week later. (Complaint at ¶ 10) When Plaintiff informed Father O'Shaughnessy about the abuse the priest called Plaintiff a liar and hit him with a textbook. Plaintiff also informed Father Dean, a guidance counselor at Roncalli, about the abuse. (Complaint at ¶ 11) Based upon these factual allegations, Plaintiff asserted one cause of action based on negligence.

25. *John Doe No. 17 v. Diocese of Pueblo:* The John Doe No. 17 Complaint, which has been attached hereto as Exhibit Q, asserts that John Doe No. 17 was born in December of 1954 and attended Roncalli High School during his freshman and sophomore year until it closed in 1971. (Complaint at ¶ 7) John Doe No. 17 claims that Father Mueller asked him to stay after band class one day. John Doe No. 17 went into Father Mueller's office where Mueller placed a rag soaked in ether over his face causing him to fall to the ground. Father Mueller sexually assaulted John Doe No. 17 while he was unconscious. (Complaint at ¶ 9) Based upon these factual allegations, John Doe No. 17 asserted one cause of action based on negligence.

26. *Donald Jesik v. Diocese of Pueblo*: The Jesik Complaint, which has been attached hereto as Exhibit R, asserts Jesik was born in July of 1954 and attended Roncalli High School from 1968 through 1971. (Complaint at ¶ 17) Following school one afternoon Mueller asked Jesik if he could help move items into the band room. (Complaint at ¶ 18) In the band room Mueller told Jesik that he would like Plaintiff to participate in a science experiment. Mueller placed a cloth soaked in ether over Jesik's mouth and sexually abused him once he lost consciousness. (Complaint at ¶ 20-21) Based upon these factual allegations, Jesik asserted one cause of action based upon negligence.

12

27.     *J.M. v. Diocese of Pueblo*:   The J.M. Complaint, which has been attached hereto as Exhibit S, asserts that J.M. was born in 1952 and was asked by Mueller in the Spring of 1968 if he could assist with a science experiment after school.  (Complaint at ¶ 17)  At this time Mueller led J.M. into an office and was informed to inhale ether which would help Mueller collect data.  (Complaint at ¶ 18)  J.M. awoke thirty minutes later and "felt nauseous, queasy and his anus was sore."  (Complaint at ¶ 19)  Based upon these factual allegations, J.M. asserted one cause of action based upon negligence.

28.     *Jack Klun v. Diocese of Pueblo*:   The Klun Complaint, which has been attached hereto as Exhibit T, asserts Klun was born in 1949 and attended Roncalli High School from 1965 through 1968.  Mueller asked Klun to help with research after school.  Klun was instructed to enter a closet at which time Mueller snuck up from behind him and placed a cloth soaked in ether over his mouth.  (Complaint at ¶ 20)  In Spring of 1968 Klun informed a school guidance counselor about Mueller's actions and he was told not to participate in any more of Mueller's experiments.  (Complaint at ¶ 23)  Based upon these factual allegations, Klun asserted one cause of action based upon negligence.

29.     *Monroe v. Diocese of Pueblo*:   The Monroe Complaint, which has been attached hereto as Exhibit U, asserts that Monroe was born on December 26, 1952 and attended Roncalli High School from 1966 through 1970.  (Complaint at ¶ 17)  During band practice Mueller informed Monroe that he could play the trombone better if he played in the nude.  (Complaint at ¶ 21)  Mueller sexually abused Monroe as he played the trombone.  Based upon these factual allegations, Monroe asserted one cause of action based upon negligence.

30.     *T.A. v. Diocese of Pueblo*:  The T.A. Complaint, which has been attached hereto as Exhibit V, asserts T.A. was born in 1951 and was a junior at Roncalli High School in March of 1969 when Mueller asked him to participate with research for Mueller's thesis to earn a psychology masters.  (Complaint at ¶ 18-19)  Mueller requested T.A. meet him in a music room at which time Mueller placed a towel soaked in ether over T.A's face causing him to fall asleep.  (Complaint at ¶ 19)  Mueller sexually assaulted T.A.  The following week Mueller asked T.A. to participate in the experiment again.  (Complaint at ¶ 20)  This time T.A. did not fall asleep and became hysterical when Mueller attempted to sexually assault him.  Based upon these factual allegations, T.A. asserted one cause of action based upon negligence.

31.     On information and belief, Mueller sexually abused other students at Roncalli High School besides the Claimants.

32.     On information and belief, the Marianists and/or the Diocese assigned Mueller to teach at other school(s) prior to his assignment at Roncalli High School.  During his assignment at these previous schools, Mueller sexually abused students.

33.     On information and belief, the Diocese and the Marianists were aware of Mueller's sexual abuse of minors prior to assigning him to Roncalli High School.

34.     On information and belief, despite knowing Mueller's history of sexual misconduct and propensity to abuse minors, the Diocese placed him in a position where he had access to minors, including the Claimants.

35.     On information and belief, the Diocese and the Marianists knew of Mueller abusing some of the Underlying Plaintiffs immediately after the abuse.

36.     On information and belief, the Diocese and Marianists knew of Father Burke's propensity to sexually abuse minors prior to his abuse of John Doe No. 7.

37.     On information and belief, despite knowing Father Burke's propensity to abuse minors, the Diocese placed him in a position where he had access to minors, including the Claimants.

## THE ALLEGED POLICIES

38.     On or about October 5, 2005 the Diocese notified the Company of the Underlying Actions involving John Doe No.'s 1 through 9, Jesik, J.M., Klun, Monroe and T.A., and requested coverage under two insurance policies the Diocese claimed North River issued, which were alleged to be numbered CBP43233 effective October 15, 1968 through October 15, 1971 and numbered ML67168 effective October 15, 1971 through October 15, 1974 (hereinafter "Primary Policies").

39.     On or about December 1, 2005 the Company sent a letter to the Diocese advising that after thoroughly searching its records, the Company was unable to locate policies CBP43233 or ML67168, but requested that the Diocese provide any addition information concerning the material terms of any alleged policies.

40.     In March of 2006 the Diocese sent the Company a number of documents it contended were secondary evidence of the existence and material terms of the Primary Policies.

41.     In its attempts to prove the material terms of the Primary Policies, the Diocese submitted a 1966 Policy Jacket with the following relevant terms:

### *Definitions*

When used in this policy (including endorsements forming a part hereof):

. . .

      **"bodily injury"** means bodily injury, sickness or disease sustained by any person;

. . .

      **"damages"** includes damages for death and for care and loss of services resulting from **bodily injury** and damages for loss of use of property resulting from **property damage**;

. . .

      **"insured"** means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage.  The insurance afforded applies separately to each **insured** against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

. . .

      **"named insured"** means the person or organization named in Item I. of the declarations of this policy; and

. . .

      **"occurrence"** means an accident, including injurious exposure to conditions, which results, during the policy period, in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured.**

…

### *Conditions*

6.    **Other Insurance.**  The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance.  When this insurance is primary and the **insured** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

      When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a)   **Contribution by Equal Shares.**  If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b)   **Contribution by Limits.**  If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

. . .

10.   **Three Year Policy.**  If this policy is issued for a period of three years, the limits of the company's liability shall apply separately to each consecutive annual period thereof.

* * *

*COVERAGE A – BODILY INJURY LIABILITY*
### COVERAGE B – PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the **insured** shall become legally obligated to pay as **damages** because of

Coverage A.  **bodily injury or**
Coverage B.  **property damage**

to which this insurance applies, caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the **insured** seeking **damages** on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

…

17

## II.    *PERSONS INSURED*

Each of the following is an **insured** under this insurance to the extent set forth below:

(a)      If the **named insured** is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor;

(b)      If the **named insured** is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such; and

(c)      If the **named insured** is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such.
. . .

## III.   **LIMITS OF LIABILITY**

Regardless of the number of (l)  **insureds** under this policy, (2)  persons or organizations who sustain **bodily injury** or **property damage**, or (3)   claims made or suits brought on account of **bodily injury** or **property damage**, the company's liability is limited as follows:

**Coverage A –** The limit of **bodily injury** liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all **damages** because of **bodily injury** sustained by one person as the result of any one **occurrence;** but subject to the above provision respecting "each person", the total liability of the company for all **damages** because of **bodily injury** sustained by two or more persons as the result of any one **occurrence** shall not exceed the limit of **bodily injury** liability stated in the declarations as applicable to "each **occurrence".**

Subject to the above provisions respecting "each person" and "each **occurrence",** the total liability of the company for all **damages** because of (1)  all **bodily injury** included within the **completed operations hazard** and (2)   all **bodily injury** included within the **products hazard** shall not exceed the limit of **bodily injury** liability stated in the declarations as "aggregate".
. . .

**Coverages A and B** – For the purpose of determining the limit of the company's liability, all **bodily injury**  and **property damage**  arising out of

18

continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence.**

### IV.   POLICY PERIOD; TERRITORY

This insurance applies only to **bodily injury** or **property damage** which occurs during the policy period within the **policy territory.**

42.   In April of 2006 the Company sent a letter to the Diocese agreeing to defend the Diocese against the claims of John Doe No.s 1 through 9, Jesik, J.M., Klun, Monroe and T.A, but reserving its rights on a number of bases to decline coverage for the Underlying Actions.

43.   In June of 2006, the Diocese notified the Company of Underlying Actions involving John Doe No.s 10 through 17 and requested coverage under the Primary Policies.

44.   In July of 2006, the Company sent a letter agreeing to defend the Diocese against the claims of John Doe No.s 10 through 17, but reserving its rights on a number of bases to decline coverage for the Underlying Actions.

45.   The Diocese also contends North River issued the Diocese an umbrella or comprehensive catastrophe policy with limits of $5,000,000, but the Diocese has not provided North River with a policy number, policy period or any material terms of any umbrella or comprehensive catastrophe policy.

46.   As of the filing of this Complaint, discovery is progressing in the Underlying Actions, and no trial dates have been set.

### COUNT I—

**No Coverage Available Under The Alleged Primary Policies Because The Diocese Has Failed To Prove The Existence Of Material Terms Of The Alleged Policies.**

47.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 of its Complaint for Declaratory Judgment as though fully set forth herein.

48.     The Diocese has failed to prove the material terms of the Primary Policies allegedly issued by the Company.

49.     As a result of the Diocese's failure to provide information sufficient to prove the material terms of the alleged Primary Policies, the Company has no obligation to defend or provide insurance coverage to the Diocese in the Underlying Actions.

## COUNT II-

**No Coverage Available Under The Alleged Excess Policy Because The Diocese Has Failed To Prove The Existence Of Material Terms of The Alleged Policies.**

50.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 of its Complaint for Declaratory Judgment as though fully set forth herein.

51.     The Diocese has failed to prove the material terms of an Excess Policy allegedly issued by the Company.

52.     As a result of the Diocese's failure to provide information sufficient to prove the existence or material terms of the alleged Excess Policy, the Company has no obligation to provide insurance coverage to the Diocese of the Underlying Actions under the alleged Excess Policy.

## COUNT III-

**The Marianists Are Not Insureds Under The Policies**

53.     In the alternative, Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 of its Complaint for Declaratory Judgment as though fully set forth herein.

54.     "Insured" is defined in the alleged Primary Policies as "any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage."

55.     "Persons Insured" under the alleged Primary Policies are "the named insured . . . and any executive officer, director or stockholder thereof while acting within the scope of his duties as such."

56.     The Complaints filed in the Underlying Actions contain allegations that the Marianists obtained consent from the Diocese to "staff and administer Roncalli High School with priests and monks from the Society of Mary."

57.     The Primary Policies provide coverage only for employees, executive officers, directors or shareholders of the Diocese while acting within the scope of their duties.

58.     The Marianists are not employees, executive officers, directors or shareholders of the Diocese and North River has no obligation to defend or indemnify the Marianists in the Underlying Actions, as the Marianists are not insureds under the Primary Policies.

## COUNT IV—

**Some of the Plaintiffs In The Underlying Complaints Do Not Allege "Bodily Injury" Caused By An "Occurrence" During the North River Policy Periods.**

59.     In the alternative, Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 of its Complaint as though fully set forth herein.

60.     The Primary Policies provide coverage for "bodily injury…caused by an occurrence," subject to the terms, exclusions and conditions of the Primary Policies.

61.     "Bodily injury" is defined in the Primary Policies as ""bodily injury, sickness or disease sustained by any person."

62.     The Primary Policies only provide coverage for "[b]odily injury…which occurs during the policy period…."

63.     To the extent any of the Claimants suffered "bodily injury" as a result of an "occurrence" outside the effective dates of the Primary Policies, North River has no obligation to indemnify the Diocese for any of the claims for bodily injury occurring outside the effective dates of the Primary Policies.

## COUNT V—

### There Is No Coverage For Non-Fortuitous Injury

64.     In the alternative, Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 of its Complaint as though fully set forth herein.

65.     Liability insurance policies do not provide coverage for non-fortuitous injuries.

66.     The Diocese knew of Mueller's and Father Burke's propensity to sexually abuse minors prior to the time in which they sexually abused the Claimants.

67.     The Diocese's actions or omissions are directly related to Brother Mueller's and Father Burke's alleged abuse of the Claimants and the alleged injury caused was not fortuitous.

68.     Because the alleged sexual abuse and injury of the Claimants was not fortuitous, the Company has no obligation to defend or provide insurance coverage to the Diocese in the Underlying Actions.

## COUNT VI—

### There Is No Coverage For Known Losses or Losses In Progress

69.     In the alternative, Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 of its Complaint as though fully set forth herein.

70.     Colorado law bars insurance coverage for any insured that is aware that the damages would flow directly and immediately from its intentional act.

71.     At the time the Company is alleged to have issued the insurance policies to the Diocese, as well as at the time of Brother Mueller's and Father Burke's alleged abuse of the plaintiff's in the Underlying Actions, the alleged policies were not applicable to losses which were known at the time or in progress.

72.     The Diocese was aware that Brother Mueller and Father Burke abused minors prior to the time in which Brother Mueller and Father Burke abused the plaintiffs in the Underlying Actions.

73.     The Diocese's actions or omissions related to Brother Mueller's and Father Burke's alleged abuse of the Claimants was the result of and part of a loss-in-progress and was a known loss.

74.     Because the alleged abuse and bodily injury of the Claimants was a loss in progress or a known loss, the Company has no obligation to defend or indemnify the Diocese.

## COUNT VII—

### The "Accident" Or "Occurrence" Was Expected By The Diocese

75.     In the alternative, Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 of its Complaint as though fully set forth herein.

76.     The Primary Policies provide coverage only for "bodily injuries" resulting from an "occurrence", subject to any such policies' terms, conditions and exclusions.

77.     The Diocese knew of, or knew of accusations that Brother Mueller and Father Burke sexually abused minors prior to any abuse of the Claimants.

78.     The Diocese expected Brother Mueller to sexually abuse minors during the time period it alleges that the Company issued it liability insurance.

79.     The Diocese expected Father Burke to sexually abuse minors during the time period it alleged that the Company issued it liability insurance.

80.     Such expected sexual abuse does not qualify as an occurrence.

81.     Because the Diocese expected the alleged sexual abuse, the Company has no obligation to defend or provide insurance coverage to the Diocese in the Underlying Actions.

WHEREFORE, Plaintiff The North River Insurance Company respectfully requests that this Court enter judgment in its favor and against the Defendant as follows:

A.     Declaring this Court has jurisdiction over the parties and the subject matter of this litigation.

B.     Declaring the Diocese has failed to prove the existence or material terms of primary general liability policies the Company allegedly issued to the Diocese between October 15, 1968 through October 15, 1971 and October 15, 1971 through October 15, 1974, and therefore the Company is not obligated to provide a defense or insurance coverage to the Diocese.

24

C.      Declaring the Diocese has failed to prove the existence or material terms of any excess or comprehensive catastrophe policy the Company allegedly issued to the Diocese, and therefore the Company is not obligated to provide a defense or insurance coverage to the Diocese.

D.      In the alternative, declaring that the Company owes no duty to defend or provide insurance coverage to the Diocese under the alleged policies issued by the Company in the Underlying Actions or in any other claims against the Diocese arising out of allegations related to the alleged sexual abuse committed by Brother Mueller or Father Burke.

E.      In the alternative, declaring the Marianists are not insureds under any policies the Company allegedly issued to the Diocese.

F.      In the alternative, declaring the Claimants have no beneficial interest in any policies the Company allegedly issued to the Diocese.

G.       Awarding the Company its costs in this suit, and

H.      Finding other relief that this Court deems appropriate.


DATED: October 3, 2006

*Original Signature on file at the offices of*
*Treece, Alfrey, Musat & Bosworth, P.C.*
*        s/Mark A. Pottinger*
By:_____
        Mark A. Pottinger
        Treece, Alfrey, Musat & Bosworth, P.C.
        999 18th Street, Suite 1600
        Denver, Colorado  80202
        (303) 292-2700 - phone
        (303) 295-0414 - fax
        Attorneys for Plaintiff
        THE NORTH RIVER INSURANCE COMPANY

Christopher J. Raistrick
Michael R. Gregg
Todd M. Rowe
Merlo Kanofsky Brinkmeier & Gregg Ltd.
208 S. LaSalle Street, Suite 950
Chicago, Illinois 60604
(312) 683-7189 – phone
(312) 553-1586 – fax
Attorneys for Plaintiff
THE NORTH RIVER INSURANCE COMPANY
**Seeking Admission Pro Hac Vice**