IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01971-WDM-CBS

---

DEPOSITION OF: GARTH H. ALLEN
EXAMINATION DATE: April 10, 2008

---

THE NORTH RIVER INSURANCE COMPANY,

Plaintiff,

v.

BISHOP OF PUEBLO, a corporation sole; THE MARIANISTS PROVINCE OF THE UNITED STATES, INC.; RONALD L. HOUSTON; TOM MONROE; DONALD JESIK; JACK KLUN, J.M., T.A.; and JOHN DOES 1-20,

Defendants.

---

PURSUANT TO NOTICE, the deposition of GARTH H. ALLEN was taken at 11:00 a.m. on April 10, 2008, at 822 7th Street, Suite 270, Greeley, Colorado 80631, before Gail Obermeyer, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.

Gail Obermeyer
Registered Professional Reporter

EXHIBIT D

paragraph 10?

Q Paragraph 10. Thank you. You state, "I have reached an opinion regarding the issue of North River Insurance Company's duty to defend in The Marianists Province of the United States and The Bishop of Pueblo under policy CBP 43233, effective October 15, 1968 to October 15, 1971, for claims alleged in underlying actions described more fully and the Plaintiffs complaint in amended complaint filed herein." And if you could just state for the record what your opinion is on the North River Insurance Company's duty to defend the Marianists.

A Well, first of all, North River does have a duty to defend the Marianists, because the underlying, at a minimum, policy was in existence from 1968 to 1971. The underlying policy, as a result of the language that I cited in paragraph 17, coupled with some other indicators -- importantly, the certificate of insurance in paragraph 14 and the agreement entered into between Roncalli High School, Bishop of Pueblo, and the Marianists, whereby there are obligations outlined between the two; especially important, the language that I quoted in



paragraph 18 and somewhere else here, 15 -- creates a situation where the Marianists become insureds really for two reasons: as a result of the definition of insured in paragraph 17, coupled with the fact that the management agreement for the school makes the Marianists officers, essentially; and the additional insured language, which I realize doesn't show up in the policy itself, with the exception of one endorsement that blankets employees, but nevertheless, the certificate of insurance evidences that the Roncalli High School is an additional insured.

So for all those reasons, the Marianists become insureds under the North River policy. Once they are insureds, the allegations in the complaint come within the scope of coverage for purposes of duty to defend.

Q Okay. You mentioned --

A That was an awfully long answer. I'm sorry about that.

Q It was, and we'll go through that answer. You refer to an agreement between the Marianists and the Bishop of Pueblo. And I'm going to show you what was previously marked as



Glodek Exhibit 2. And is that the agreement that you're referring to?

A Yes, it is.

Q For the record, it's BOP 017 through BOP 020. And you talk about the language in the contract in paragraph 17 on page 3?

A That's correct.

Q And let's take a look at --

A Now, my paragraph 17 refers back to what's paragraph 5 here.

Q Thank you for that clarification. And paragraph 5 of the agreement states, for the record, "A Marianist appointed by the Marianist Provincial Administration and approved by the Bishop of Pueblo, shall be Principal and Chief Executive Officer of the school and shall act for the school in all relationships between the school and other bodies so long as said school is operated as a boys' school, as set forth in paragraph 2 above."

Is this the paragraph that you referred to which -- under which the Marianists would become an additional insured under a policy issued to the Bishop of Pueblo?

A More accurately stated, they



simply become an insured under this paragraph, not an additional insured. They are included within the definition of insured.

Q And can you explain to me why they're included?

A Because the definition of insured, which includes any executive officer, orients right back to paragraph 5, where it says a Marianist will be the chief executive officer; officer, officer, done.

Q And it says, "A Marianist appointed by the Marianist Provincial." Now, would it mean a Marianist, meaning the Marianist appointed, or the whole Marianists organization?

A The Marianists appointed and the Marianists organization for liability arising from the school because of management of the chief executive or anyone within his -- I think we can safely assume it's a he -- command. Captain of the ship kind of stuff. But not the Marianists for all of their activities in wherever else they might function; St. Louis, Kansas City. I don't know what all they do. But, no, it doesn't provide for everything they

do, but for the activities identified here, which means the activities relative to Roncalli High School.

Q Right. But what I'm trying to point out is it says, "A Marianist appointed." It does not say the Marianists organization.

A Right.

Q And, in your opinion, there is no distinction between a Marianist appointed and the Marianists organization?

A I think it's a progression. There is a difference, but you're going to get to the same result. The route might be just a little bit longer. If you had an act of negligence on behalf of a person in the school or an act of negligence based on supervision or the conduct of the school or how it's run or hiring, or any of those areas, that could attach to the principal. The principal's activity then attaches to the Marianists and, therefore, you get there if you can follow the -- what? -- connect the dots, for lack of a better description.

Q So we have a Diocese of Pueblo who owns the school. Is that your understanding?

A Say that again.



Q The Diocese of Pueblo owns Roncalli High School?

A I believe so.

Q And they contract with the Marianists to operate Roncalli High School --

A Yes.

Q -- under this contract. And a Marianist is appointed as the chief executive officer of the school?

A That's what I think. Now, the ownership of the property may change from time to time. As you might know, it gets conveyed back and forth, or at least it looks like it does.

Q So for purposes of who was the chief executive officer, the Marianist appointed would be the chief executive officer of Roncalli High School?

A Exactly.

Q And the chief executive officer of Roncalli High School falls under the Diocese, who owns the high school?

A I don't think I can tell you that. It simply falls under the definition of the named insured, because they are an executive officer. And that's what it says. If the named insured is



designated as other than an individual partnership or joint venture, any executive officer -- and they're not a partnership or a joint venture, they're a corporation sole.

Q Right, but any executive officer would be the individual?

A Yes, initially, that's correct.

Q And the individual is not necessarily the same as the organization?

A I agree. But so I don't mislead you, the only way to protect that -- if you protect that individual, you are, by definition, protecting the organization. The two become basically unseparable -- inseparable.

Q Now, you have, I assume, reviewed the policy of insurance that was issued by International Insurance Company that was discovered after you had written your report; is that correct?

A I have.

Q And your review of the International Insurance Company policy, does that change at all the testimony that you've given in this affidavit?

A No. But so I don't mislead you,



if you were to redo the affidavit, I would probably add another supporting aspect making the Marianists also insureds. If you look at paragraph 6 of the agreement, where we just were, it creates a situation where the Marianists are not in an independent contractor situation, but rather more of an employee situation. That conclusion results because paragraph 6 says, "The school shall be conducted in accordance with the religious program and educational policies of the Diocese"; not the Marianists, the Diocese. So what education occurs there, how it occurs there, the nature of the program, the process, is determined by the Diocese, not by an independent contractor Marianists, which means it's more employee oriented and less independent contractor oriented, or at least that's my reading of it.

Once you conclude -- and the duty to defend is so broad that all it takes is a possibility of coverage, not an absolute coverage. So, you know, you're not looking for conclusory evidence, you're looking for some evidence. If then you go back to the policy, the policy has an endorsement on it, and it is L 9131, if you have yours.

Q Sure. And can you identify for the record what page you are looking at?
A By Bates number?
Q Yes.
A BOP 895.
Q And what about this do you rely on?
A Well, this, at least pursuant to the specs, is the only page I can find that seems to add additional insureds. And, indeed, that's what it says at the time, teachers liability coverage, including optional medical payments. And then the schedule says, name of individual, blanket. Standard in the industry is that you use the word blanket, and it equals everybody.
So the schedule are basically everybody, every individual, every organization that has a connection with the teaching function. And that, of course, would include the Marianists, because the -- as we all know, the certificate of insurance says it covers Roncalli High School. And the Certificate of Insurance covers the Marianists, but in the insurance policy, on the front of it, it only says the Diocese of Pueblo.
So the issue is, how do we get from



Diocese of Pueblo to the Marianists. And the answer is at least two ways: The definition of insured and the endorsement adding additional insureds. If you add secondary documents, assuming something might have been left out of this or got lost or be missing, which is always a possibility, the Certificate of Insurance certainly suggests there's probably another page that should have been here adding more insurance. But even without it, there's enough here to establish coverage.
Q Now, you say adding another page establishing coverage. Where would this page be added?
A Oh, anywhere within the endorsement sections. It would just be an additional insured endorsement naming the Marianists.
Q And that would be included with a policy such as the one that's Bates stamped BOP 862 --
A Well, it could be.
Q -- through 910?
A As I said, it would helpful for a clearer understanding, but not essential for the



duty to defend.
Q And going back to the teachers liability coverage endorsement, BOP 895, if we could just go back to that. And you said blanket equals everyone?
A That's right.
Q And how do we get everyone to include the Marianists?
A Because in the context of what we're talking about, this is teachers liability coverage, and it says, it's agreed that with respect to the teaching activities of the insured named in the schedule below, Exclusion B and C1 are deleted under the coverage. Subject to the following, none of following provisions would apply to this lawsuit. It's a workers' comp provision, injury to other employees, and a care, custody, and control property exclusion. None of which is important.
So when we try to figure out the teaching activities of the insured named in the schedule below, the insured named is blanket. So anybody that has any responsibility for teaching at the school -- any person, any organization -- becomes an insured. If the insurance company did



not want that to happen, it could have named fewer teachers.
Q You mean it could have named individuals instead of blanket?
A Yeah, yeah. Teacher Murray, Teacher Smith, Teacher Jackson, but left out others. And it didn't do that.
Q So looking at --
A Blanket.
Q Looking at BOP 17, which is the contract, under paragraph 6 you -- is it your opinion that the teachers at Roncalli High School were employees of the Diocese of Pueblo?
MS. CASEY: Object to the form.
A Well, they were employees. They were teachers. All of that we know for sure. Their relationship with the Diocese of Pueblo is employee oriented, because the Diocese of Pueblo gets to direct what they do. And the Diocese of Pueblo is paying the Marianists, who, in turn, seem to pay what small income teachers get. So for all those reasons, I say, yes, they are the functional equivalent of employees of the Diocese.
Q (BY MS. KRAYER) At the same time,

Page 54

are they employees of the Marianists?
A Less directly, but I would say indirectly, yes. They're almost in a dual employment status. That one I don't really care much about. That's not going to help me determine coverage, and I don't really have enough information to tell that.
Q So for the purposes of coverage under the International Insurance Company policy, if the teachers are considered employees of the Diocese, the teachers themselves would be covered, but the organization of the Marianists, how are they covered?
MS. CASEY: Object to form.
A The organization of the Marianists, if their liability is a result of the conduct of the insured teacher, they effectively become an insured, also. And, in addition, the Marianists themselves, by the organization, by the use of the word blanket, as I tried to say in my answer, would include any individual or any organization with teacher liability exposure.
Q (BY MS. KRAYER) So any organization -- any organization affiliated with a teacher?

Page 55

A Exactly -- well, that was liable for the teacher. Part of the problem here is you have to be careful to separate between the issue of indemnification, which requires a judgment and knowing who's liable for what, and a duty to defend. And in this situation, if you want to defend the Marianists so you can truly find out the source of their liability, you have to extend that, because there is, at a minimum, a possibility of coverage. Some of the questions you're asking are really kind of to be determined.
Q For example, if a teacher were to be sued out of his teaching duties at Roncalli High School as an individual --
A Correct.
Q -- in your opinion, which organization would be responsible for -- strike that. If a teacher of Roncalli High School were sued as an individual, to which direction would he look for insurance coverage? To the Diocese of Pueblo or to the Marianists?
MS. CASEY: Object to the form.
MR. BRADY: Object to the form.
A Both, but principally the Diocese

Page 56

of Pueblo.
Q (BY MS. KRAYER) Because he would be considered an employee of the Diocese of Pueblo?
A Right.
Q And we've talked about paragraph 5 of the agreement between the Marianists and the Diocese and paragraph 6 of the agreement. Is there any other place in this agreement that you can point me to which you would establish that the Marianists would be considered uninsured under the International insurance policy?
A Yes.
Q And what would that be?
A Under paragraph 2, at the end of the first paragraph there's a sentence that says, "The Diocese agrees to pay the aforementioned Society of Mary, Province of St. Louis, compensation for each of the respective religious [sic] assigned to the schools by said Marianists."
So the payment -- and I have puzzled over that sentence a long time. I think it's possible there's a word left out, and it should be "each of the respective religious teachers

Page 57

assigned to the school." I said Marianists. But I don't know that; that's a guess. But importantly, the Diocese are paying the bill, and it's based on a per religious foundation. So once you're paying the bill, it creates the possibility that you are an employer. That shows up again in paragraph 1, by the way, where it says, "The Diocese of Pueblo assumes full financial responsibility for Roncalli High School." So, financially, theirs.
When you get to the very end of provision 2, it's the third paragraph, there is language there that says, "The Diocese further agrees to provide the Marianists assigned to said school such benefits that may be at any future date be provided for members of other religious congregations similarly employed in the Diocese." And I thought the words "similarly employed" were particularly significant, because it's automatically stating that the Marianists are employed. Otherwise, there could be no one else similarly employed. It doesn't say any other similar independent contractor. It says similarly employed.
Q Now, my reading of the first

sentence of that paragraph, it looks to me similarly employed in the Diocese?

A That's right, that's right exactly.

Q And what about this forms your basis that the Marianists are an additional insured?

A Well, it says that the Marianists are going to get benefits. I assume that means, you know, vacations, health insurance, whatever it is we're talking about. It's benefits that are similar to other people employed by the Diocese similarly. And you are -- if there are other people similarly employed, I think by definition it means whoever you're talking about is employed. That's my logic, anyway.

Q And how does that lead to coverage for the Marianists organization?

A Well, if you conclude that the Marianists employed there are insureds, then liability coming to the Marianists organization, because of the Marianists that are there, is automatically protected by protecting the insureds. I think it's also true that the Marianists organization, as you read this, has an



overall teaching function; because the Marianists Provincial administration, in paragraph 5, is the one that gets to appoint the Marianists.

It is also extremely important to remember in the underlying complaint, the liability of the Marianists is alleged because of supervision, selection, those kind of issues. But it derives from the conduct of Brother Mueller in the school and a little bit that other guy, but he's only mentioned once -- Father something, Burke.

Q And we have discussed paragraph 1 of the agreement, paragraph 2 of the agreement, paragraph 5 of the agreement, and paragraph 6 of the agreement.

A Correct.

Q Is there anything else -- any other points in this agreement that you can point to that forms the basis for your opinion that the Marianists are an additional insured?

A I think those are the main aspects. I would only add that when you read the entirety of it, it is clear that control of how the school curriculum, schedule, and function at the end of day, is the Diocese to control. It's



not controlled out of St. Louis. So if you look, for example, on the top of page 2, the Marianists with approval of the -- mine is smudged there, but I'm pretty sure it says Diocese. So the Diocese has to approve the curriculum and schedule of the administrator, the textbooks, all that stuff. That's the only way it would be consistent with paragraph 5.

Q And because --

A Not 5, 6.

Q And because the Diocese has to approve the curriculum, the teachers -- I just want to make sure I'm getting this straight. The teachers are, therefore, considered employees of the Diocese?

MS. CASEY: Object to form.

A That's just another factor that supports it. It doesn't stand alone on that. Read through the entirety of the document. It reads as an employment relationship, not an independent contractor. Otherwise, you just say, you know, conduct education at the high school, you decide how to do it. Then the Marianists become independent contractors. That's not what happens. If you're leaving this stuff, I would



tell you before we go, you do gain a little bit of additional support from my conclusion in the supplementary agreement. I don't want to leave that out.

Q (BY MS. KRAYER) The supplementary agreement -- what supplementary agreement are you referring to?

A The one that's attached to the agreement that you just read.

Q And do you have a Bates number?

A 20.

Q Okay.

A BOP 20.

Q Can you tell me what about the supplementary agreement supports your basis?

A Well, there's a mutual agreement that the Diocese shall pay the Marianists the sum of $1,800 during the initial year of operation under this particular contract; that is, during the fiscal year beginning July 1 for the service of each Marianist assigned to the school. So the Diocese would pay. Whether or not that money ever comes back individually to each Marianist teacher, we can't tell. I don't care. They are paying the Marianists organization for the

Page 62

employees.
Q And what about that -- the Diocese paying the Marianists for the teachers --
A It adds to the employee perception. You're not paying them for a function, you know, have a high school, they're paying on a per-teacher basis.
Q So this adds additional support to the fact that the Marianists, as teachers, were employees of the Diocese?
MS. CASEY: Object to form.
A Yes, it does.
MR. BRADY: Counsel, can I see a copy of the contract?
THE DEPONENT: You want to read that word, don't you?
MS. KRAYER: You know what? I think I gave you the one that's marked as the exhibit.
MR. BRADY: Let's take a look at that for a second. I don't think it's any better than my copy, and that's the problem.
MS. KRAYER: It's the one right on top.
MR. BRADY: Yes, yes. No, it's

Page 63

not any better. Thanks.
Q (BY MS. KRAYER) Now, earlier you said is you were to redo the affidavit today, you would add some additional support that you garnered from the agreement, which we just we went over. If you were to redo the affidavit today, would you add anything else lending support to your conclusions made in this affidavit?
A Well, I would have to fix -- I don't know if it's really additional. In the affidavit, I'm essentially saying I'm confident there is coverage from all the secondary evidence. If I were to redo it, I would now have to say I know there's coverage, because I have a policy that memorializes that fact. So I could brag a little bit; I mean, what I thought was true, was.
Q And would you state anything else?
A I don't think so.
Q Under paragraph 20 of your affidavit, we talked about this a little bit earlier. I want to go back to that. It says, "Under Colorado law, it is axiomatic that the

Page 64

duty to defend under a policy of comprehensive liability insurance is triggered whenever there is a colorable claim for coverage presented by the allegations contained in the underlying complaint."
A Yes.
Q And what do you consider a colorable claim?
A When the underlying complaint contains an allegation -- true or false is irrelevant -- that it's enough to create the possibility of coverage, that's sufficient to trigger a duty to defend. So unlike other areas of bad faith where if it's reasonably debatable, you get to debate it, in the duty to defend, the insurance companies don't get to. Many argue that's grossly unfair, but that's the way it is.
So if you think, gee, maybe we need to defend, maybe we don't, you've automatically admitted you need to defend. It is amazingly broad in Colorado. The standard basically set out in the Hecla case, but also Hecla's progeny after that, and there are law review articles on it, you can find one by David Hersh, that basically emphasizes an insurance company that

Page 65

doesn't defend in Colorado is -- better be very, very confident that there's not one speck or smidgen or anything indicating you should, or that conduct can be a breach of the duty.
There's a process. You start to defend, then later you can file your declaratory action. You can do a number of things to figure out if you really have to do it. And, of course, North River got it right once. Well, at least not in bad faith, once, by agreeing to defend the Diocese. I'm not sure it was so cool to include a reservation of rights, but we'll save that for another day. They just got it wrong with the Marianists.
Q And in paragraph 22, you state -- you state, "If a possibility of coverage exists, the practice in the insurance industry in Colorado is to provide coverage pending a determination by a court that the duty to defend does or does not exist." And can you explain to me what a "possibility of coverage" means?
A Not much more than what those words say. I mean, you can put it in probabilities, if you like. It's just almost akin to a criminal standard. You have to be sure



Page 98

Q So the claim itself is the defense?

A The request for a defense. That's what I'm talking about. And it was denied, I think, without conducting a reasonable investigation based upon all available information. In fact, it was based on no information; just, "We don't have a policy. We don't think you're an insured. Go away."

Q And going back to Section III, we talked about failing to adopt and implement reasonable standards. And what is your opinion -- do you have an opinion as to how -- strike that. Do you believe that North River implemented unreasonable standards in this matter?

MR. BRADY: Object to the form.

A Yes.

Q (BY MS. KRAYER) And can you tell me why?

A Because if North River's conduct is consistent with its standards, beyond a reasonable conduct necessarily shows unreasonable standards. I haven't seen a document that says, "This is our standards." I haven't analyzed any

Page 99

such document. I'm simply saying if their conduct evidences their standard, then the conduct in this case is reprehensible; therefore, they must not have a reasonable standard.

Q And in No. II, how would you characterize "reasonably promptly"?

A Well, first of all, it doesn't have any universal definition. It depends on the particular facts. But within the particular facts, nothing is more urgent than a request for a defense in a lawsuit; because, as you know as an attorney, it has a short fuse on it to answer that complaint, otherwise you get the default. So it's faster than a property insurance claim, up there with a health insurance claim. You get more time in a life insurance claim. It varies, depending which aspect of insurance we're talking about. And in this case, it's not really a close issue, because there is no response to the Marianists at all until the declaratory action is filed. And that's long after they had to begin defending themselves without any help from the insurance carrier.

Q And is it your opinion that this was unreasonable?

Page 100

A Yes.

Q And under the subsections that we've talked about under h, these form the basis of your opinion that North River acted in bad faith?

A That's right.

MR. BRADY: When you say that, Counselor, you're talking about the subsections he's identified, obviously, correct?

MS. KRAYER: That's correct.

MR. BRADY: Obviously, more than one subsection?

MS. KRAYER: Yes, all the subsections we discussed so far falling under h.

Q (BY MS. KRAYER) And what else, other than the subsections that we have discussed, that led you to form the opinion that North River acted in bad faith toward the Marianists?

A My opinion is also compelled by the bad faith standard. You and I talked about that in a third-party context. It is simply an unreasonable or a negligent standard. Unlike a first-party context, where it has to be unintentional or reckless, that's not required

Page 101

here. It just has to be unreasonable.

And, in addition, it's driven by the information that I learned from Mr. McNamara and from Susan Maccario, in her denial letter, and the position of the company with regard to lost policies. It is, in my opinion, inconsistent with another test of bad faith, which is the equal consideration doctrine. I alluded to that, in passing, in one of the prior questions, but it's not on these standards. So I just wanted to be sure you didn't leave it out.

Q Can you explain to me your understanding of the equal consideration doctrine?

A It's just part of the general issue of bad faith; generally stated as, give the rights and interests of the insured at least as much consideration as the insurance company gives to its own financial objectives.

Q And it's your opinion that North River violated the equal consideration doctrine?

A That's right, yeah, absolutely. As the file shows, North River didn't want to find the policy very badly. They didn't go look

for one.

Q And what's the basis of your opinion?

A Because they didn't do any investigation to try to find one. I mean, they said, "If you find the policy and bring it to us, we'll think about it." That's not fair. It makes the insured adjust their own claim.

Q And you spoke a moment ago about Mr. McNamara. And what about the information you garnered from him -- and I assume it's from the information from his deposition?

A Yes. Well, a couple things there are important. First of all, he did, at the time of his deposition, acknowledge that there is underlying coverage from '68 to '71, but is not very helpful or fair with regard to the excess policy and fundamentally considers it to be the insured's duties, be it the Bishop of Pueblo or the Marianists, to bring in an official something that stands for the excess policy from North River in existence from '68 to '71.

That's a perversion of appropriate rules. You can produce a policy when it's lost from secondary evidence. And I think that's very



easy to do in this case. And he takes a narrow and, I think, self-serving approach to that issue. I'm bothered by that. I think it's bad faith.

Q Is it bad faith in the respect of North River's duty to defend the Marianists?

A Yes, but that's really a little different issue. And, of course, there's a secondary issue on the excess policy. Are we really going to need it? And I don't know that yet, but it looks like a possibility, and it would sure be a lot easier way to resolve this claim if North River or Crum & Forster, better way to put it, would admit that an excess policy exists. And the evidence is overwhelming.

Q How does Mr. McNamara's testimony form -- further support or form the basis that North River acted in bad faith toward the Marianists regarding their duty to defend?

MR. BRADY: Are you talking about just now focused on the issue of not accepting secondary evidence? That's where you were before. His deposition is, obviously, very long, and you're not asking him about all of his deposition. You're just limited to that issue, I



assume?

MS. KRAYER: Yes, Bill, you are right.

MR. BRADY: All right. In that regard, then, I will not object. Otherwise, the question is vague, overbroad, and unfair. Did you understand the question?

A I think so. My central concern was the issue of lost policies with regard to the Marianists. The position was -- I think there were several improprieties. I think, if I remember right, he stated that unless they had a tender of a claim from the Marianists, they weren't going to honor it. That's wrong. That's a breach of the duty to respond to claims and make a decision relevant to coverage.

Secondly, on the excess policy, which could impact both the Marianists and the Bishop of Pueblo, again, he has a narrow approach that is not exactly fair to him. But as if to say, you got lucky, and you found one of them, but you haven't found the other one yet. If you find it, come in, and you'll have a claim. That's -- as I say, that's not what he said, but that's the gist of it; not accepting secondary evidence to show a



policy.

And that's another violation of the Unfair Claims Act and the Colorado approach to lost policies. And you don't have to be able to find a policy to have a claim. They can be reconstructed; they frequently are from secondary evidence. And Mr. McNamara should be accepting that fact and sharing in the burden to try to reconstruct it reasonably and figure out what it does.

Q (BY MS. KRAYER) Is it your understanding that an insurance company has a duty to defend under an umbrella policy?

A Well, the umbrella -- this umbrella policy, I'm absolutely sure, the Defender policy, follows form. And because it follows form and the underlying policy has a duty to defend, so does the other one. Now, financially, that isn't going to kick in. As long as the underlying policy is doing what it should do, there's no limit on the defense costs. So it would be impossible for the excess policy to kick in.

Q Mr. McNamara's position on the umbrella policy, how does that support the basis